UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Byron Martin,                      :
          Plaintiff,               :
                                   :
     v.                            :      File No. 1:03-CV-240
                                   :
Vermont Department of              :
Corrections, Steven Gold,          :
and Celeste Marie Girrell,         :
          Defendants.              :

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Papers 50 and 65)

Plaintiff Byron Martin, a Vermont inmate proceeding
*pro se*, claims that he has been subjected to
unconstitutional prison conditions.  Specifically,
Martin claims that overcrowding at Vermont's Northeast
Regional Correctional Facility ("NERCF") forced him to
sleep on a mattress on the floor for several months.
Martin also alleges that the prison had no air
conditioning in the summer, inadequate heat in the
winter, and insufficient food supplies.  Martin argues
that these issues rose to the level of constitutional
harm, and brings his action pursuant to 42 U.S.C. §
1983.  (Paper 5).

For relief, Martin's complaint requests damages and
injunctive relief. (Papers 5 and 6).  Earlier in the
case, the Court dismissed Martin's claims for injunctive

relief because Martin is no longer incarcerated in
Vermont.   The Court also dismissed Martin's claims for
damages against the Vermont Department of Corrections,
as well as his damages claims against the individual
defendants in their official capacities.   (Papers 13 and
15).   Currently pending before the Court are the
parties' motions for summary judgment on the remaining
claims.   (Papers 50 and 65).

<u>Factual Background</u>

Prior to moving to Vermont in 2002, Martin was on
parole in California.   The State of California
transferred his parole to Vermont in January, 2002, and
Martin came here to live and work with his brother.   On
June 5, 2002, Martin was arrested and charged with
felony possession of stolen property in connection with
two burglaries committed in Vermont.   He was held
without bail as a parole violator, and was housed at
NERCF.   (Paper 50 at 2).   On March 30, 2003, Martin was
convicted of felony possession of stolen property and
sentenced to a term of 5 to 10 years in prison.   <u>Id.</u> at
3.

Martin claims that for the six months following his

June 5, 2002 arrest, he was forced to sleep on the floor of the prison cell that he shared with two other inmates.  (Paper 5 at 3; Paper 6 at 1).  Martin also claims that, during his time at NERCF, there was no air-conditioning.  Instead, the facility had an "air blower" that merely distributed hot air throughout the building. During the winter months, Martin claims that the temperature in his cell often fell below freezing. (Paper 6 at 1-2).  As a result of his prison conditions, Martin allegedly developed a "medical condition" which was treated with medication.  (Paper 6 at 3).[1]  Martin seeks damages for the stress and trauma he allegedly suffered while at NERCF.

The defendants concede that Martin slept on a mattress on the floor of his cell for much of the period between June 12 and December 10, 2002.  (Paper 50 at 3). They explain that "NERCF housed more inmates than it contained bunks, so many cells with two bunk beds had a

---

[1]  Martin's filings also reference a previous lawsuit in which, in addition to the claims brought here, he claimed that overcrowding resulted in inadequate portions of food for each prisoner.  See Martin v. Vermont Dep't of Corrections, No. 1:02-CV-272 (Paper 3).  That suit was dismissed without prejudice for failure to exhaust administrative remedies. Id. (Paper 20).

mattress on the floor that served as a third bed.  The
inmates who slept on a mattress on the floor were issued
an additional blanket."  Id. (citing Ex. B, Aff. of Mark
Russell, ¶¶ 7-9).  The defendants also claim that Martin
had the option of moving to a bed prior to December 11,
2002.  Bed choice was allegedly a matter of seniority in
each cell.  The defendants contend that Martin had
numerous new cellmates prior to December 11, 2002, that
he often had the option of moving to a top bunk, and
that he took the top bunk on a few occasions.  See
Russell Aff., ¶ 11.  It was only after a bottom bunk
opened up, however, that Martin decided to move off of
the floor permanently.  Id.

Martin appears to challenge this claim in part,
asserting that he "never ever had the top bunk in Bravo
unit."  (Paper 7 at 18).[2]  At his deposition, Martin
conceded that although at least one new inmate moved
into his cell prior to December 11, 2002, he did not ask
the inmate to leave the top bunk vacant because he did
not "want to push suffering on someone else."  Martin

---

[2]  It is not clear from the record whether or not
Martin spent his entire time at the NERCF in "Bravo
unit."

4

Dep. Tr. at 196.  When a bottom bunk opened up on December 11, 2002, Martin claims that he decided to move off the floor "[b]ecause when you reach a point where you're physically getting conditions where it's disturbing then I had to make a change."  Id.  Martin also conceded at deposition that he never asked prison officials to move him either to a top bunk or to a bunk in the prison gymnasium.  Id. at 222.

The parties dispute the question of how cold the conditions were during the winter at NERCF.  Martin contends that there was no heat whatsoever during the winter of 2002-03, and that he was often able to freeze water in his cell.  (Paper 55 at 15-17).  The defendants argue that this claim is "objectively incredible," and note Martin's deposition testimony that the water in the toilets was not frozen.  (Paper 50 at 8, n.4).  The defendants have also submitted the affidavit of Jackie Adams, a corrections officer who states in her affidavit that the cells were heated well above freezing, and that she completed her shifts at that time without wearing a jacket.  (Paper 59, Ex. A, Aff. of Jackie Adams, ¶ 12). Martin disputes the accuracy of the Adams affidavit.

(Paper 62).

There does not appear to be any dispute with respect to Martin's claim that the prison was hot in the summer, and that the ventilation system at the prison merely blew the hot air around.  (Paper 6 at 2-3).  The defendants do claim, however, that Martin has failed to make a constitutional claim with respect to the heat issue.  (Paper 50 at 10).  The defendants also claim that Martin never exhausted his administrative remedies with respect to this claim.  Id.

The defendants also allege that Martin never exhausted his administrative remedies on the issue of the adequacy of the food at NERCF.  Martin's amended complaint asks that the Court incorporate the factual claims he asserted in his prior suit.  (Paper 6 at 1).  That complaint includes a claim that NERCF was not equipped to feed all of its inmates, and that the meals were, therefore, lacking.  See Martin v. Vermont Dep't of Corrections, File No. 1:02-CV-272 (Paper 3).  In the instant case, Martin counters the defendants' claim that "the kitchen prepared food in accordance with the number of inmates in the facility, not in accordance with the

number of permanent beds," with the assertion that he
"was not getting enough food all the time such as 2
biscuits and a scoop of pudding for dinner one night."
Russell Aff., ¶ 24; (Paper 65 at 2).

Finally, the parties have offered conflicting
accounts with respect to Martin's attempts to file
grievances for his respective claims.  On the issue of
access to a bunk, Martin claims that he first filed a
grievance on October 8, 2002.  The defendants claim that
the signature of the corrections officer on this
grievance is a forgery, and that the Department of
Corrections ("DOC") never received the grievance.
Russell Aff., ¶¶ 15-16.  The defendants further contend
that Martin did not file a grievance on the bunk issue
until after he made a permanent move to a lower bunk.
Id.

The parties have a similar dispute with respect to
Martin's grievances on the issue of cold temperatures in
his cell.  Martin claims that he filed a grievance on
this issue on December 19, 2002.  (Paper 55 at 4, 17).
The defendants, noting that the alleged grievance is
signed in the wrong place by the corrections officer,

contend that DOC never received it.  The parties agree
that Martin grieved the cold issue on February 15, 2003.
(Paper 50 at 10).  The parties also agree that within 12
days of this latter filing, plastic was placed over the
window of Martin's cell and a maintenance person
attended to, and at least to some extent fixed, the
heating unit.  (Paper 55 at 17); Russell Aff., ¶¶ 21-22.

Finally, the defendants claim that Martin never
exhausted his administrative remedies with respect to
his heat and food claims.  Martin refers the Court to
his October 8, 2002 grievance in which he allegedly
claimed that the prison was overcrowded, that there was
inadequate food, and that people were being forced to
sleep on the floors.  (Paper 65 at 2).  Again, the
defendants claim that DOC never received this grievance.
Russell Aff. ¶¶ 15-16.

The defendants now move for summary judgment,
claiming (1) that because Martin has failed to allege a
physical injury, the Prison Litigation Reform Act
("PLRA") bars him from collecting compensatory damages;
(2) that Martin has failed to meet his burden for
punitive damages; (3) that he has failed to exhaust his

8

administrative remedies on the issues of food supplies and air conditioning at NERCF; (4) that he has failed to show the defendants were personally involved in the alleged wrongdoing; (5) that Martin's claims fail to rise to the level of an Eighth Amendment violation; and (6) that the defendants are entitled to qualified immunity.  Martin has asked that his filings in response to the defendants' motion for summary judgment be characterized as a cross-motion for summary judgment. (Paper 65 at 3).  For the reasons set forth below, I recommend that the defendants' motion for summary judgment be GRANTED, and that Martin's motion for summary judgment be DENIED.

Discussion

I.  Summary Judgment Standard

     Summary judgment should be granted only if, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Moller v. North Shore Univ. Hosp., 12 F.3d 13, 15 (2d Cir. 1993).  A

fact is material when it affects the outcome of the suit under governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute of fact is not genuine if there is insufficient evidence for a jury to find in the nonmoving party's favor.  See id. at 252.

Here, the parties have each moved for summary judgment.  With respect to the defendants' motion, they carry the burden of establishing that no genuine issue of fact exists.  See Celotex Corp., 477 U.S. at 323. Their burden will be met if they "can point to an absence of evidence to support an essential element of the nonmoving party's claim."  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  If the defendants meet this burden, the plaintiff must respond with a showing sufficient to establish the existence of that claim or element.  See Celotex Corp., 477 U.S. at 322-25.  "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citing Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)).  The plaintiff bears this same burden on his

10

motion for summary judgment.  While the fact that the
plaintiff is proceeding *pro se* requires the Court to
read his filings "liberally and interpret them to raise
the strongest arguments that they suggest," the
application of this modified standard "does not relieve
plaintiff of his duty to meet the requirements
necessary" to either support his own motion or defeat
that of the defendants.  <u>Jorgensen v. Epic/Sony Records</u>,
351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

II.  <u>Personal Involvement</u>

In their motion for summary judgment, defendants
Gold and Girrell claim that Martin has failed to show
their personal involvement in the alleged wrongdoing.
It is well established that in order for a state
official to be liable under 42 U.S.C. § 1983, he or she
must have been personally involved in the alleged
constitutional violation(s).  <u>See</u> <u>Al-Jundi v. Estate of</u>
<u>Rockefeller</u>, 885 F.2d 1060, 1065 (2d Cir. 1989) (general
doctrine of *respondeat superior* does not suffice and a
showing of some personal responsibility is required);
<u>McKinnon v. Patterson</u>, 568 F.2d 930 (2d Cir. 1977).
Here, there is no allegation that either defendant Gold

or defendant Girrell directly deprived Martin of a bunk,
heat, air conditioning or food.  Rather, Martin is suing
Gold and Girrell because of their positions as
supervisors.  Indeed, in his deposition Martin
acknowledged that he had never communicated directly
with either defendant, and that he has sued them
"because they're in charge of the conditions and
environment, they're like the landlords of the domain."
Martin Dep. Tr. at 232-33.

The Second Circuit has determined that supervisor
liability under § 1983 may be established under limited
circumstances.

> Supervisory liability under § 1983 "can be
> shown in one or more of the following ways: (1)
> actual direct participation in the
> constitutional violation, (2) failure to remedy
> a wrong after being informed through a report
> or appeal, (3) creation of a policy or custom
> that sanctioned conduct amounting to a
> constitutional violation, or allowing such a
> policy or custom to continue, (4) grossly
> negligent supervision of subordinates who
> committed a violation, or (5) failure to act on
> information indicating that unconstitutional
> acts were occurring."

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)

(quoting Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir.

2003)).  It is clear from the record that neither

12

defendant had "actual direct participation" in the
alleged constitutional violations.  Id.  The only
allegation that the defendants even had notice of
Martin's claims is that they either did, or should have
received such notice through the grievance procedure.

The Vermont Department of Corrections has a
grievance procedure consisting of three steps.  (Paper
50, Ex. D, Murphy Aff. Attachment 1).  First, the inmate
must state the nature of his claim on a form entitled
Grievance Form #1.  After Form #1 is received by prison
personnel, copies are forwarded to a work site manager,
who then assigns a staff member to investigate the
claim(s).  The investigator is required to complete his
investigation and submit a report, with recommendations,
on Form #2 within 15 days of the assignment.  The work
site manager is then required to make a decision
regarding the grievance within three workdays.  Id.

If a prisoner is not satisfied with the
recommendations or actions arising out of Form #2, he
may continue with the process by submitting Grievance
Form #3 to the Commissioner of the Department of
Corrections.  The Commissioner may appoint a second

13

investigator and, in any event, must communicate his decision to the inmate in a reasonable time.  The grievance to the Commissioner is the final step in the grievance process.  If, at any time, the prisoner has not received a response within the prescribed time frames, "the offender may assume the grievance has been denied and may proceed to the next step in the grievance process."  Id.

The question of notice to defendant Girrell presents a close issue.  Girrell was employed at NERCF in 2002-03, and has signed grievances in her role as a work site manager.  (Paper 50, Ex. F attachments).  Martin admits that he never dealt with Girrell directly, but claims that Girrell either did or should have received notice of his claims through his grievances filed in October and December, 2002.  Girrell responds by claiming that she never received Martin's alleged grievances in 2002.  (Paper 50, Ex. F at ¶¶ 4-5).  Her claim is bolstered by Mark Russell's affidavit stating that DOC has no record of the 2002 grievances, and that the prison official's signature on the October, 2002 grievance appears to have been forged.  (Paper 50, Ex. B

at ¶¶ 15-19).

As discussed above, at summary judgment the Court must view the facts in a light most favorable to the plaintiff.  Thus, the Court must accept Martin's claim that he filed a grievance in October, 2002 with respect to inadequate food and bedding, and in December, 2002 with respect to the cold temperatures in his cell. (Paper 50, Ex. B at Attachments 5 & 6).  The Court is not required, however, to accept Martin's claim, without further factual support, that his grievances ever reached the supervisory level.

Indeed, there is no evidence in the record to show that Girrell received, reviewed, or had notice of the alleged 2002 grievances.  Martin himself appears to admit that Girrell may not have ever received his complaints, as he states in one of his filings that the "original grievance" was "lost" by NERCF staff.  (Paper 55 at 8).  Martin also falls short of alleging that Girrell and Gold knew of his prison conditions, claiming only that they "both knew or should've known about the conditions of confinement that I was complaining about." Id. at 2.

Where the record shows that Girrell did receive notice of Martin's complaints, it also shows relatively prompt action in response to those complaints.  In her affidavit, Girrell states that she first learned of Martin's heat-related complaints in February, 2003. (Paper 50, Ex. F, Girrell Aff., ¶ 4).  At that time, she was informed that maintenance had been called to work on the heat in Martin's cell.  She was also told that plastic had been placed over the windows, and that her security and operations supervisor had met with Martin "and had resolved his outstanding issues."   Id.

Similarly, Girrell attests that she did not learn of Martin's bunking issue until February, 2003.  By that time, Martin was sleeping on a bunk.  Id., ¶ 5.  With respect to any other complaints, bunk-related or otherwise, Girrell again states her belief that her security and operations supervisor had resolved all outstanding issues.  Id.  In his deposition, Martin conceded that although the October and December, 2002 grievances did not achieve immediate action, his later grievances received responses on all issues, and that those responses included a meeting with Mark Russell,

16

supervisor of security and operations at NERCF.  Id. at
233-35.  Accordingly, the record shows that when Girrell
received notice of Martin's claims, those claims either
had been or were being addressed, and no further action
was required.

As to defendant Gold, the defendants note that Gold
was not the Commissioner when Martin was first detained.
Gold did not assume his post as Commissioner until
January 17, 2003.  (Paper 50, Ex. E, Gold Aff., ¶ 2).
Therefore, even if the Court accepts Martin's claims
that he filed grievances in October and December, 2002,
Gold would not have been notified of those grievances
until he assumed his position.

On April 28, 2003, Gold responded to a grievance
from Martin claiming inadequate heat.  Id. at Attachment
1.  In his response, Gold informed Martin that the
problem had been addressed.  Id.  Martin asserts that
Gold was "misinformed."  (Paper 55 at 6).  Nonetheless,
there is no dispute that Gold was led to believe that
the heating issue had been addressed.

Gold also responded to Martin with respect to the
bedding issue.  (Paper 50, Exhibit E, Attachment 2).  In

a letter dated April 29, 2003, Gold explained that overcrowding had required the use of cots and mattresses.  Gold also noted that "because of frequent transfers and movement among the inmate population, regular bedding or bunk beds open up on a routine basis. Inmates who have been assigned supplemental bedding should be rotated to a bunk bed when practicable.  I note that you are currently sleeping on a bunk bed." Id.  In fact, it is undisputed that Martin was sleeping on a bottom bunk over two months prior to the time that Gold became Commissioner.  Given these facts, it cannot be claimed that defendant Gold violated Martin's constitutional rights by failing to respond to his claims.

The role of a court at summary judgment is to weigh the facts before it, and not to make credibility determinations.  See Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).  The nonmoving party, however, may not rely on "conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  Indeed, Martin "must do more than simply show that there is some metaphysical doubt as to the

18

material facts." Matsushita Elec. Indus. Co., Ltd., v.
Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The
material issue here is not whether Martin did nor did
not file grievances in 2002.  On this question, as noted
above, the Court must accept Martin's allegations and,
for the purposes of summary judgment, assume that the
2002 grievances were submitted.  The relevant question
for supervisor liability is whether the defendants were
on notice of Martin's claims in 2002.  If they were not,
the record indicates that later grievances received
adequate responses.

Martin's filings fail to show that either Gold or
Girrell had notice of his claims in 2002.  While the
Court must view the evidence in a light most favorable
to Martin, his evidence amounts only to speculation that
Gold and Girrell either knew or should have known about
his situation.  In contrast, the direct evidence shows
that Girrell and Gold did not, in fact, have notice of
Martin's prison conditions until after those conditions
had been addressed and/or remedied.  Thus, there is no
basis for finding supervisor liability on the ground
that the defendants failed to adequately respond to

information that was actually provided to them.

The record suggests one other possible basis for supervisor liability: the existence of a custom or policy that sanctioned unconstitutional conduct. Specifically, the affidavits of DOC personnel state that due to overcrowding, NERCF was compelled to adopt a procedure that included inmates sleeping on mattresses on the floor.  Russell Aff., ¶¶ 8-10; Gold Aff., ¶ 5. Martin contends that these "overcrowding conditions" were unconstitutional.  Paper 6 at 2.

Martin's claim in this regard should fail.  Martin had the option of moving to a bunk prior to December, 2002, but he opted not to because he did not "want to push suffering on someone else."  Tr. at 196.  The bunk procedure operated according to seniority, with new inmates receiving the last choice of bed.  Inmates were jailed three persons to a cell, with two in a bunk bed and one on the floor.  Mark Russell's affidavit states that Martin had several new cellmates after August 1, 2002, but that he chose to remain on the floor for much of the time prior to the vacancy of the bottom bunk. Russell Aff., ¶ 11.  Although at deposition Martin did

not recall this high rate of cellmate turnover, he did admit that he allowed at least one new cellmate to occupy the top bunk while he remained on the floor.  Tr. at 195-96.  Accordingly, it appears that Martin chose to bypass the prison procedure that would have alleviated his sleeping on the floor.

Moreover, NERCF's procedure with respect to placing prisoners on the floor with mattresses was not, by itself, unconstitutional.  The Eighth Amendment bars conditions that "deprive inmates of basic human needs" or "the minimal civilized measures of life's necessities."  See Rhodes v. Chapman, 452 U.S. 337, 345-46 (1981).[3]  As the Supreme Court has noted, "the

---

[3] Martin contends that he was a pre-trial detainee at NERCF, and that his claims should therefore be analyzed under the Fourteenth Amendment.  The defendants have submitted evidence to show that while at NERCF, Martin was being held without bail as a parole violator pursuant to a detainer from the State of California.  Russell Aff., ¶ 8.  The detainer was not lifted until August 9, 2003, nearly five months after his conviction in Vermont.  Id., ¶¶ 10-11.  Because Martin was a parole violator, and not merely a pre-trial detainee during the period in question, his conditions of confinement claims must be analyzed under the Eight Amendment.  See Rankin v. Klevenhagen, 5 F.3d 103 (5th Cir. 1993) (Eighth Amendment governs a section 1983 excessive force claim brought by a pretrial detainee, who at the time of his arrest was on parole from a state correctional facility); Crawford v. Foti, 1993 WL 515760, at *4 (E.D. La. Dec. 3, 1993) ("Insofar as some of the plaintiffs

Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort . . . . [T]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 348, 347.  Relevant to this case, several courts have held that providing an inmate with a mattress on the floor, absent other conditions, does not violate the Eighth Amendment.  See Brown v. Crawford, 906 F.3d 667, 672 (11th Cir. 1990); Mann v. Smith, 796 F.2d 79, 85 (5th Cir. 1986); Perkins v. Kansas D.O.C., 1997 WL 383072, at *3 (D. Kan. June 9, 1997); see also Zolnowski v. County of Erie, 944 F. Supp. 1096, 1115 (W.D.N.Y. 1996) (living on floor of cell "may not alone support a violation").  Thus, the practice of temporarily placing inmates on mattresses on the floor is not a per se violation of the Eighth Amendment, and the adoption of that practice will not support a finding of supervisor liability for either

---

were already convicted or were held as parole violators, even if not yet revoked, the more appropriate avenue of scrutiny [for their condition of confinement claims] would be under the Eighth Amendment.").

defendant.

Because Martin has failed to make allegations and/or provide evidence sufficient to hold the defendants liable as supervisors, the Court should GRANT the defendants' motion for summary judgment.

III.  Actual Physical Injury

The defendants also argue that Martin's damages claims, the only claims currently remaining in the case, are barred by his failure to allege physical injury.  In his amended complaint, Martin claims that his injuries included "medically diagnosed stress, psychological trauma that I had to go seek help from the psychiatrist, pain and suffering, mental anguish, hardship and deprivation, mental and physical stress both temporary and permanent, and extreme traumatization due to the overall conditions that persisted."  (Paper 6 at 3).  In response to the defendants' argument that these injuries constitute mental rather than physical injuries, Martin contends that he suffered "stress-related physical injury."  (Paper 55 at 17).

The PLRA states in relevant part: "No Federal civil action may be brought by a prisoner confined in a jail,

23

prison, or other correctional facility, for mental or
emotional injury suffered while in custody without a
prior showing of physical injury." 42 U.S.C. §
1997e(e). The PLRA further states: "As used in this
section, the term 'prisoner' means any person
incarcerated or detained in any facility who is accused
of, convicted of, sentenced for, or adjudicated
delinquent for, violations of criminal law or the terms
and conditions of parole, probation, pretrial release,
or diversionary program." 42 U.S.C. § 1997e(h). Because
Martin had been accused of crimes in Vermont, and was
being held for violations of his conditions of parole,
the PLRA clearly applies in this case.

The Second Circuit has held that the PLRA bars
claims for compensatory damages arising out of claims of
mental or emotional injury. See Thompson v. Carter, 284
F.3d 411, 417 (2d Cir. 2002). Although Martin insists
that he has physical injuries resulting from his stress,
he has failed to specify the nature of these injuries.
Furthermore, physical manifestations of stress are
insufficient to establish physical injury under the
PLRA. See, e.g., Alonzo v. Sqyres, 2002 WL 1880736

24

(N.D. Cal. Aug. 9, 2002) (plaintiff taken to hospital for high blood pressure, brought on by "gruesome psycholog[ical] harassment[ ]" has not suffered a prior physical injury); <u>Pinkston-Bey v. DeTella</u>, 1997 WL 158343, at *3 (N.D. Ill. Mar. 31, 1997)(severe headaches are not physical injury).  Accordingly, Martin may not receive compensatory damages for his stress-related injuries.

IV.  <u>Punitive Damages</u>

Although the Second Circuit has barred compensatory damages for mental or emotional harm, the <u>Thompson</u> court also held that nominal and/or punitive damages are permissible under the PLRA.  284 F.3d at 418 (joining majority of circuits).  In his prayer for relief, Martin asks for punitive damages and exemplary damages.  (Paper 6 at 4).  A claim for punitive damages under § 1983 must show that "'the defendant's conduct [was] motivated by an evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"  <u>See</u> <u>Disorbo v. Hoy</u>, 343 F.3d 172, 186 (2d Cir. 2003) (quoting <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983)).

25

The record in this case lacks any evidence that either Gold or Girrell acted with the sort of evil intent or recklessness that would satisfy the demanding standard for punitive damages.  As discussed above, the facts show that when Gold and Girrell received grievances from Martin, the issues presented in those grievances either were, or had already been, dealt with in a reasonably prompt manner.  Accordingly, Martin's claims for punitive and exemplary damages should be denied, and summary judgment should be GRANTED in the defendants' favor on these claims.

## Conclusion

For the reasons set forth above, I recommend that the defendants' motion for summary judgment (Paper 50) be GRANTED, and the plaintiff's motion for summary judgment (Paper 65) be DENIED as moot.

Dated at Burlington, in the District of Vermont, this 25th day of May, 2005.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of

the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. <u>See</u> Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).